UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROBERT SCHLUETER,                  Case No. 1:12-cv-88

      Plaintiff,                              Judge Michael R. Barrett

      v.

ROHM AND HAAS CHEMICALS, LLC,

      Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Rohm and Haas Chemical LLC's Motion for Summary Judgment (Doc. 25), Plaintiff Robert Schlueter's Memorandum in Opposition (Doc. 30), and Defendant Rohm and Haas Chemical LLC's Reply (Doc. 35).

**I.**     **FACTUAL SUMMARY**

The following background is derived from the record, with all disputed facts construed in Plaintiff's favor.

Defendant Rohm and Haas Chemical LLC's ("Defendant") produces specialty chemicals used to manufacture PVC pipe, vinyl siding, windows, plastic bottles, and blister packaging. (Doc. 25-2, ¶ 4). One of the rooms Defendant uses for its operations is referred to as a Melt Room. (*Id.*, ¶ 6). The Melt Room is used to melt the tin, isolate and pressurize the tin at the blow tanks, and inject the tin into the reactor train. (*Id.*) The Melt Room contains a series of hot oil tracer lines that are used to maintain the tin in molten form so it can be transported through the piping. (*Id.*, ¶ 7). The hot oil tracer piping contains oil that is approximately 600° F. (*Id.*)

1

The Melt Room contains two different systems of hot oil tracers: those for the fill piping and those for the feed piping. (*Id.*, ¶ 8). The fill piping moves the molten tin from the main melt to the blow tanks whereas the feed piping moves the pressurized tin from the blow tanks to the reactor train. (*Id.*) The fill piping is located in the Melt Room, and the feed piping is located partially in the Melt Room and partially outside the Melt Room. (Doc. 25-4, Ex. 3, pp. 53-54). The hot oil tracers run alongside the fill piping and feed piping to ensure that the tin remains in molten form. (Doc. 25-2, ¶ 9).

In early 2010, Defendant contracted with Complete Mechanical Services, LLC ("CMS") to design and install a new hot oil tracer system on the fill piping in the Melt Room. (*Id.*, ¶ 10). Braden Bollmer ("Bollmer") was the CMS Project Manager who designed and installed the new hot oil tracer system. (Doc. 25-4, Ex. 3, pp. 61-62). After the installation, Defendant determined that there were flaws in the installation of the compression fittings at the piping connections, and thus, contacted Bollmer. (Doc. 25-2, ¶¶ 14-15). Bollmer considered the work "warranty work." (Doc. 25-4, Ex. 3, p. 56).

Defendant made the decision as to the process for locking out and tagging out the hot oil tracer lines that the CMS employees were to inspect and repair. (*See* Doc. 25-4, Ex. 2, pp. 63, 79-80; *see also* Doc. 25-3, ¶ 8). Defendant also performed the initial lockout and tag out of the system. (*See* Doc. 25-4, Ex. 2, pp. 63, 79-80; *see also* Doc. 25-3, ¶ 8).

On or about April 19, 2010, CMS employees were sent to Defendant's facility to repair the flawed connections. (*Id.*, ¶ 16; Doc. 25-4, Ex. 6). Plaintiff was one of the CMS employees that agreed to assist at Defendant's facility. As CMS employees

2

arrived at the job site, they were required to sign a permit sheet and put their locks in a lock box. (Doc. 25-4, Ex. 3, p. 76). The permit sheet allegedly informed the CMS employees about the scope of the work, including which lines had been locked out, but that document has not been produced by Defendant. Bollmer testified that he then explained the job to the CMS employees and directed them as to which sections of the hot oil system to work on. (*Id.* at 83). Bollmer testified that he did not know that he had an understanding of which line was live because it was not relevant. (*Id.* at 81).[1] He also testified that he could not recall what he told the CMS employees regarding which lines were locked out. (*Id.* at 86-87). According to the CMS employees, Bollmer informed them that the entire room was locked out. (Doc. 25-4, Ex. 1, pp. 85-86; Doc. 25-4, Ex. 4, pp. 18-19; Doc. 25-4, Ex. 5, p. 29). Plaintiff also testified that it was his understanding that all of the hot oil tracing in the room was turned off. (Doc. 25-4, Ex. 1, pp. 82, 85). The CMS employees further testified that Bollmer instructed them to check any of the tubing that looked like it was new and generally instructed them on an area within which to work. (Doc. 25-4, Ex. 4, pp. 18-20; Doc. 25-4, pp. 30-31).

CMS employees Eric Maertz and Frederick Rice testified that Defendant's personnel did not speak with them at all whether in relation to the scope of the work, the lockout and tag out of the system, or the inspection of the work. (Doc. 25-4, Ex. 4, pp. 18, 20-21; Doc. 25-4, Ex. 5, pp. 25-26, 37-39). Plaintiff testified, however, that a supervisor for Defendant informed him that all of the hot oil tracer lines were locked and

---

[1] Although Defendant contends that Bollmer testified that he informed the CMS employees that a portion of the piping was still "live," the portions of his deposition on which it relies does not support that contention. (*See* Doc. 24-4, Ex. 3, pp. 123-24). Instead, Bollmer testified that he could not recall exactly what he said in regards to what was locked out. (Id.)

3

tagged out and informed him that he was supposed to check all of the hot oil tracers. (Doc. 25-4, Ex. 3, pp. 82-83).

While in the course of his work on the tracer lines, Plaintiff attempted to check and repair a compression fitting on the hot oil system for the feed piping. As Plaintiff began to open the connection on the line, the pipe began smoking, hissing and leaking. (Doc. 25-4, Ex. 4, pp. 34-34; Doc. 25-4, Ex. 5, p. 44). Seconds later, the pipe opened and hot oil splashed on Plaintiff. (Doc. 25-4, Ex. 4, pp. 34-35; Doc. 25-4, Ex. 5, p. 44). Plaintiff suffered second degree burns on his right and left legs and on the back of his right hand. (Doc. 25-4, Ex. 6).

The CMS Accident Investigation Report lists Bollmer as the supervisor and is dated April 19, 2010. (Doc. 25-4, Ex. 6). The Accident Investigation Report indicates that "[o]nly part of the Hot Oil System was locked out" but the "CMS employees were under the impression entire system was down and locked out." (Doc. 25-4, Ex. 6). It further indicates that "[a]lthough all the CMS employees placed their personal lockout locks on the Tin Transfer Line Tracer group lockbox, none of the CMS Employees read the LOTO sheet to understand clearly what parts of the system was secured." (Doc. 25-4, Ex. 6). The Accident Investigation Report notes that Defendant's employees "had not reviewed the LOTO with all CMS employees nor had they clearly communicated to each CMS employee what if any of the system was still active." (*Id.*) The subsequent section of the Accident Investigation Report notes that Defendant took the corrective measures of instituting a line break procedure that includes tagging of every place a break in a line is to be made, revised the LOTO procedure, and decided to include certain training in the orientation process. (*Id.*)

4

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 1065 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.*

On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential of that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. <u>ANALYSIS</u>

Plaintiff asserts a claim for negligence against Defendant in this matter. The issues in dispute on summary judgment are whether Defendant (1) owed Plaintiff a duty to furnish a safe workplace, (2) breached the duty, and (3) proximately caused Plaintiff's injuries.

### 1. **Duty**

Plaintiff does not dispute that he was not an employee of Defendant but rather was a "frequenter." Ohio Revised Code §§ 4101.11 and 4101.12 impose a duty upon employers such as Defendant to protect "frequenters" by providing a safe workplace. This is a codification of the common law duty owed by a property owner to an invitee to maintain reasonably safe premises and to warn of known dangers. *Eicher v. United States Steel Corp.*, 512 N.E.2d 1165, 1167 (Ohio 1987). However, an exception to that duty applies when a frequenter is an employee of an independent contractor who performs inherently hazardous work. *Id.*; *see also Sopkovich, ADMR v. Ohio Edison Co.*, 693 N.E.2d 233, 239-44 (Ohio 1998). In such cases, the employer generally owes no duty to a frequenter. *See Sopkovich*, 693 N.E.2d at 239-44.

Defendant contends that the work for which CMS was hired was inherently dangerous. In the response in opposition, Plaintiff does not expressly dispute that the work was inherently dangerous. Therefore, the Court assumes for the purposes of this motion that CMS, including Plaintiff, was hired to perform an inherently hazardous activity such that Defendant generally would not owe a duty to Plaintiff.[2]

---

[2] Even if Plaintiff intended to argue that the work was not inherently dangerous because the danger could have been eliminated by the exercise of ordinary care by those in the custody or control of the premises, the Court finds that such an argument does not preclude the application of the inherently hazardous activity exception. As Ohio courts have recognized, the question of whether a danger is inherent depends on whether the owner retained control of the premises and is responsible for elimination of or protection against the hazard. *Frost v. Dayton Power & Light Co.*, 740 N.E.2d 734, 747-48 (Ohio App. 2000) (citing *Snow v. Freed*, No. C-890064, 1990 Ohio App. LEXIS 1825, at *5 n.2 (Hamilton App. May

Plaintiff, however, contends that he falls into the exception to the general rule. That exception applies when the employer "actively participates" in the work of the independent contractor. *Sopkovich*, 693 N.E.2d at 239-44. Active participation by the employer gives rise to a duty of care. *Id.* at 244. An employer "actively participates" in the work of the independent contractor where (1) it either directs or exercises control over the work activities of the independent contractor's employees, or (2) it retains or exercises control over a critical variable in the work area. *Id.* An employer, however, does not "actively participate" when he merely exercises a general supervisory role over the project. *Cafferkey v. Turner Constr. Co.*, 488 N.E.2d 189 (1986).

The four primary cases relied upon by the parties in the briefings are *Hirschbach v. Cincinnati Gas & Elec. Co.*, 452 N.E.2d 326 (Ohio 1983), *Cafferkey v. Turner Construction Company*, 488 N.E.2d 189 (1986), *Sopkovich v. Ohio Edison Co.*, 693 N.E.2d 233 (Ohio 1998), and *Klosz v. USS/Kobe Steel Co.*, No. No. 97CA006699, 1998 Ohio App. LEXIS 2729, at *5-11 (Ohio App. June 17, 1998). In *Hirschbach*, 452 N.E.2d at 328, an electric company hired an independent contractor to replace electrical wire conductors. The plaintiff had requested permission from the electric company to position a winch tractor a safe distance from a tower, but the company denied the request. *Id.* The plaintiff was killed when the tower arm collapsed as a result of the placement of the winch tractor. *Id.* The Ohio Supreme Court reversed summary judgment for the defendant, reasoning that a jury could reasonably conclude that the electric company

---

16, 1990)). As such, the question is one of whether the owner "actively participated" in the work of the independent contractor. *Id.*

> had sole control over the safety features necessary to eliminate the hazard. By denying the [independent contractor] crew its request to reposition the winch tractor: (1) [the electric company] refused to eliminate the hazard, (2) . . . interfered with the mode of the job operation, and (3) . . . actually participated in the job operation by dictating the manner and mode in which the winching phase of the job was to be performed.

*Id.* at 329.

Following *Hirschbach*, the Ohio Supreme Court considered how active participation applied to the work activities of an independent contractor. *Cafferkey*, 488 N.E.2d 189. In *Cafferkey*, the contractor hired a subcontractor to drill and install caisson foundations. *Id.* at 192. In one of the caisson holes, the subcontractor detected methane gas and tried to dispel the case. *Id.* However, the subcontractor allowed two of its employees to enter the hold to burn off a portion of the metal casing. *Id.* While in the hole, one employee lit a torch and an explosion occurred in which both employees were severely injured and later died. *Id.* The contractor had retained control over safety procedures of the project but was not informed of the subcontractor's decision to allow its employees to go into the hole. *Id.* The court held that the contractor owed no duty of care to those deceased employees because it did not actively participate in any work activity that led to the fatal injuries. *Id.*

More than ten years later, the Ohio Supreme Court revisited the issue of "active participation" in *Sopkovich*, 693 N.E.2d 242-43. In *Sopkovich*, the electric company hired an independent contractor to paint its electric substation. *Id.* at 238, 244. An employee of the contractor was injured by high voltage electricity while on the job and sued the electric company. *Id.* at 238. While the contractor took care of the work conducted at the electric company's site, an electric company representative would meet with the contractor's representative each morning to inform the contractor of which

8

electrical conductors had been de-activated that day to permit the contractor to perform its work.  *Id.* at 244. The electric company retained exclusive control over de-activating electrical conductors and chose which lines would be de-activated each day.  *Id.*  The contractor's employee was injured when he moved into an area where electricity was activated.  *Id.*

The issue before the Ohio Supreme Court in *Sopkovich* was whether a property owner "actively participates" in the performance of work by an independent contractor's employee when it exercises exclusive control over an aspect of an employee's work environment.  *Id.*  Looking to caselaw precedent, including *Hirschbach*, the court noted that "a property owner's retention of possession and control over the work area of an independent contractor's employees has always been an integral part of the active-participation analysis."  *Id.* at 243.  Accordingly, the court determined that "active participation" giving rise to a duty of care may be found to exist where a property owner either directs or exercises control over the work activities or where the owner retains or exercises control over a critical variable in the workplace."  *Id.*  In that case, the court held that the electric company did not actively participate in the actual work activities of the independent contractor.  *Id.* at 244.  At most, it exercised a general supervisory role over the painting project to ensure that the painting work was properly completed and had generally no contact with the independent contractor's crew except to inform them of the activated and de-activated lines.  *Id.*  Nevertheless, the court held that the electric company did retain and exercise exclusive control over a critical variable in the working environment, which was the de-activation of specific electrical conductors in the work area.  *Id.*  The duty arising from that active participation, however, was not "absolute"

and was limited to the tasks of de-electrification in the work area and dissemination of correct information concerning which conductors were energized and which had been de-activated. *Id.*

In *Klosz*, 1998 Ohio App. LEXIS 2729, at *2-3, a steel company contracted with a subcontractor at one of its steel mills. While cleaning a transformer at the steel mill, the employee was seriously burned by a surge of electricity from a nearby energy transformer. *Id.* at *3. The court considered whether the steel company or its contractor could be liable to the employee of the subcontractor for actively participating in the work activities or for maintaining and exercising control over a critical variable in the workplace. *Id.* at *7-11. The court first concluded that the defendants did not actively participate in the subcontractor's work activities. *Id.* at *8. It reasoned that (1) the employee of the subcontractor was an experienced electrician, (2) he was instructed by his foreman to clean the transformer and switch gears, (3) another employee of the subcontractor handed him the paint brush with metal around it that sparked in the electrical field, (4) the subcontractor provided all the equipment that was used, and (5) the subcontractor was responsible for assigning the duties and for overseeing completion of those duties. *Id.* at *8-9. Even if the defendants had known about the specific activities that the employee had been instructed to do, the court found that knowledge, standing alone, would have been insufficient to constitute active participation. *Id.* at *8.

Next, the court concluded that the defendants did not actively participate by maintaining and exercising control over a critical variable in the workplace. *Id.* at *9. The court gave several reasons for its holding. First, the defendants did not retain

"exclusive" control over the de-activation of the transformers.  *Id.* at *10-11.  The defendants made the decision, together with the subcontractor, to de-energize only the one transformer while keeping the other transformer energized.  *Id.* at *9-10.  It was the foreman for the subcontractor who actually de-energized the lines.  *Id.* at *8.  Moreover, there was no evidence that either defendant required the one transformer to remain energized.  *Id.* at *10.  Second, even if the defendants had retained exclusive control, there was no evidence that the energized transformer was the "critical variable" that caused the employee's injuries since the metal band on the paint brush was the catalyst that caused the flash over, and the employee's decision to use that brush in the area near the energized transformer was the critical variable that led to the injuries.  *Id.* at *11.

Given that background, the Court will now consider whether the facts construed in favor of Plaintiff show that Defendant actively participated in the work activities or retained control over critical variables in the work area.  As to the work activities, the Court finds that the evidence does not show that Defendant directed or exercised any control over the manner and method of the CMS employee's work.  The evidence shows that Bollmer was responsible for assigning duties and overseeing completion of those duties.  Specifically, Plaintiff was instructed by Bollmer as the individual tasks to perform.  CMS also provided the equipment to be used, other than the safety gear.  Although Plaintiff disputes Bollmer's testimony about his control over the CMS employee's activities, he has put forth no evidence to the contrary that suggests that Defendant, rather than Bollmer, actually controlled any of those activities.  Indeed, no evidence has been presented that shows Defendant actively gave or denied permission

11

with regard to the manner in which the tasks were to be performed.  Instead, the evidence shows Defendant had limited, if any, contact with CMS employees.  At the most, Defendant commented to the CMS employees about whether the system was live.  That single communication, however, falls within the scope of a general supervisory role and does not rise to the level of active participation.  *See Sopkovich*, 693 N.E.2d at 243-44.

As to the work area, there are at least genuine issues of material fact as to whether Defendant actively participated by retaining and exercising control over a critical variable in the work area, namely, the lockout and tag out of the system.  In regards to the lockout decision, Defendant has not demonstrated that it did not retain and exercise exclusive control over that decision.  Defendant's unsupported suggestion (Doc. 25, p. 10) that it *and* CMS made the decision to lockout only one portion of the system while keeping the other portion of the system live is insufficient.  As for the lockout itself, Defendant has admitted that it performed the lockout.  (Doc. 25, pp. 12-13).  Likewise, in regards to the tag out, Defendant does not argue that any other entity was involved in the decision on how to tag out the system or that it did not perform the tag out of the system.  Instead, Defendant maintains it was CMS's, and not Defendant's, responsibility to inform all of the CMS employees of its actions, and contends that the only dispute is whether Bollmer properly informed all of those employees.  The Court finds, however, that in accordance with *Sopovich*, Defendant had the responsibility of dissemination of correct information concerning those tasks over which it had exclusive control, whether that information was to be disseminated to Bollmer only or to CMS

employees directly. Whether Defendant did or did not disseminate the correct information goes to breach of duty rather than the existence of a duty.

Further, those areas of the work environment controlled by Defendant constitute critical variables. Here, Plaintiff was burned when hot oil from a live tracer line splashed him. Defendant's control over the de-energization of hot oil lines in the work area and the dissemination of correct information about that de-energization thus is a critical variable in relation to Plaintiff's injury. *See Sopkovich*, 693 N.E.2d at 243-44.[3] Likewise, Defendant's control over the tagging out of the de-energized line and dissemination of correct information about that tagging out, particularly where other nearby lines remained live, is a critical variable in relation to Plaintiff's injury. *See id.* Although Defendant appears to argue that those variables were not "critical" because CMS had special knowledge of the system, the Court does not believe that CMS's alleged special knowledge diminishes the importance of those variables in the working area because even with special knowledge the existence or non-existence of those could (and in this case, did) significantly alter the manner in which a worker interacts and is directed to interact with the working environment.

Accordingly, the evidence in this case reasonably could support a finding of active participation and, thus, a duty extending from Defendant to Plaintiff based upon Defendant's retention and exercise of control over critical variables in Plaintiff's working environment. Nevertheless, as the *Sopkovich* court indicated, the duty that Defendant

---

[3] The Court notes that the court in *Klosz*, 1998 Ohio App. LEXIS 2729, at *10-11, appears to have blended the breach of duty analysis and causation analysis with the critical variable analysis by finding no evidence that the energized transformer was the "critical variable" that caused the employee's injuries since the metal band on the paint brush was the catalyst that caused the flash over, and the employee's decision to use that brush in the area near the energized transformer was the critical variable that led to the injuries. This Court, however, finds that the analysis of those issues should not be conflated. A critical variable is an important characteristic of the environment as related to an injury, but does not have to necessarily be the ultimate cause of the injury.

13

may owe to Plaintiff is not absolute. Defendant's participation was limited to the lockout and tag out of the system as well as the dissemination of correct information regarding those variables. Defendant's liability thus can only be predicated on a breach of one of the specific duties that it undertook to perform.

## 2. Breach of Duty

Defendant contends that even if it owed a duty to Plaintiff, it discharged that duty by properly communicating with CMS and by properly locking out and tagging out the system. The Court disagrees for four reasons.

First, there are genuine issues of material fact as to what decision Defendant made in regards to locking down the system. More specifically, Plaintiff has presented evidence from which a reasonable jury could conclude that, contrary to Defendant's allegation that it decided to lock down only the tracer lines for the fill piping, Defendant decided to lock down the entire system. That evidence includes the absence of a permit/LOTO sheet that allegedly contained the scope of work,[4] Bollmer's testimony that he did not have an understanding as to whether other lines remained live, the testimony of CMS employees that Bollmer told them that the entire room was locked out, the testimony of Plaintiff that a representative of Defendant indicated that the entire room was locked out, and the written information in the CMS Accident Investigation Report that indicates all of the CMS employees believed the entire room was locked out. While there may be other evidence that suggests that only the tracer lines to the fill piping were to be shut down, that evidence creates conflicts in the record that must be resolved by a jury. Until those factual conflicts are resolved, the Court cannot conclude

---

[4] Defendant does not dispute in the reply that it did not produce the permit/LOTO sheet even though it was requested by Plaintiff.

14

that Defendant properly locked out the system in accordance with its decision when it locked out only the tracer lines to the fill piping.

Second, even if the evidence shows that Defendant decided to lock out only the tracer lines for the fill piping, there still is conflicting evidence as to whether Defendant disseminated the correct information in the first instance. The same evidence that is relevant above also is relevant here. Specifically, the permit/LOTO sheet, which allegedly indicates what portion of the system was locked out, has not been produced. Further, Bollmer testified that he did not have an understanding as to whether the tracer lines for the feed piping remained live, CMS employees testified that Bollmer told them that the system was completely locked out, and the CMS Accident Report indicates that CMS employees believed that the system was completely locked out. While Defendant's explanation for the conflicting evidence may be logical, the Court finds the evidence as a whole creates a question of fact that falls within the province of the jury.

Third, the testimony of Plaintiff that Defendant relies upon to demonstrate that Plaintiff knew a portion was system was live such that it did not matter what was communicated to him is not as clear as Defendant suggests. Plaintiff certainly indicates he was aware that the system had been running, but he also testified that he believed the hot oil tracer lines were locked out on the system even though other equipment, such as the boiler could have still been running. (Doc. 25-4, Ex. 1, pp. 81-83).

Fourth, Defendant contends that the only evidence supporting the allegation that it should have done more than what it did in regards to locking out and tagging out the system is the opinion of Plaintiff's expert, Michael Hayslip, which should be excluded. However, the Court has previously issued an Opinion and Order in which it denied

Defendant's motion to exclude Hayslip as an expert witness. As such, his opinion, as well as the evidence of record upon which he relied, may be considered in determining whether Defendant did what was reasonably necessary for the safety of Plaintiff in regards to locking out and tagging out the system.

Therefore, based on the foregoing, summary judgment as to breach of duty is not appropriate.

### 3. Proximate Cause

Defendant claims that any alleged negligence by it was not the proximate cause of the injury to Plaintiff because the alleged negligence of CMS was a superseding cause. More specifically, Defendant contends that CMS knew the hazards and should have communicated them to Plaintiff. As such, Defendant believes the failure by CMS to communicate the known hazards to Plaintiff relieves Defendant of liability for its negligence.

Proximate cause is an act or failure to act which in the natural or continuous sequence directly produces the injuries and without which the injuries would not have occurred. *Crawford v. Sanwardeker*, No. CA-8288, 1992 Ohio App. LEXIS 303, at *19 (Ohio App. Jan. 21, 1992). However, an act or failure to act will not be the proximate cause when an intervening cause breaks the link between a defendant's act and the injury. *Leibreich v. A.J. Refrigeration, Inc.*, 617 N.E.2d 1068, 1071 (Ohio 1993). Intervening causation is a defense to a claim for negligence. *Id.* It generally is a factual question left to a jury. *Id.* (citing *Cascone v. Herb Kay Co.*, 451 N.E.2d 815, 820 (1983) (stating that the determination of intervening causation "involves a weighing of the

16

evidence, and an application of the appropriate law to such facts, a function normally to be carried out by the trier of the facts.")).

An act or failure to act may be an intervening cause when it is both new and independent of the original negligent act. *Id.* at 1072. The term "new" means that the second act of negligence could not reasonably have been foreseen. *Id.* The term "independent" means that there is not any connection or relationship of cause and effect between the original and subsequent act of negligence. *Id.* The key determination is "whether an intervening act [that] breaks the causal connection between negligence and injury . . . was reasonably foreseeable by the one who was guilty of the negligence." *Id.* (internal quotations omitted). Therefore, when

> there intervenes between an agency creating a hazard and an injury resulting from such hazard another conscious and responsible agency which could or should have eliminated the hazard, the original agency is relieved from liability. A break in the chain of causation thereby takes place which operates to absolve the original agency. . . . Or, stating the matter a little differently, when after the negligent act a duty devolves on another person in reference to such act or condition which such person fails to perform, such failure is the proximate cause of the injury resulting from the act.

*Cascone v. Herb Kay Co.*, 451 N.E.2d 815, 820 (Ohio 1983) (quoting *Thrash v. U-Drive-It Co.*, 110 N.E.2d 419, 422 (Ohio 1953) and 45 Corpus Juris, 937, Negligence, § 496).

Here, the Court finds that reasonable minds could disagree as to whether the actions of CMS were a superseding cause of Plaintiff's injuries. Defendant's argument rises and falls on whether CMS knew of the hazards. However, as explained above, there are genuine factual disputes as to whether Defendant disseminated the correct information in the first instance to provide CMS with knowledge of the hazards. Construing the evidence in favor of Plaintiff, a reasonable jury could conclude that CMS and its employees did not have knowledge of the hazard, and thus, could not assume

17

responsibility for the control of the situation or for preventing the threatened harm related to that hazard. It also could conclude that Defendant reasonably could foresee that the dissemination of incorrect information to CMS in the first instance would lead CMS to communicate incorrect information to its employees and result in injury. Accordingly, summary judgment on the issue of proximate causation, and specifically on superseding causation, is denied.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 25) is **DENIED**.

**IT IS SO ORDERED**.

s/ Michael R. Barrett
Michael R. Barrett, Judge
United States District Court